# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 13, 2010

## STATE OF TENNESSEE v. CHRISTOPHER IVORY WILLIAMS

**Direct Appeal from the Circuit Court for Madison County**
**No. 08-193   Roger A. Page, Judge**

_____

**No. W2009-01638-CCA-R3-CD  - Filed May 9, 2011**

_____

Defendant-Appellant, Christopher Ivory Williams, was convicted by a Madison County Circuit Court jury of first degree premeditated murder and felony murder.  The trial court merged the felony murder conviction with the first degree premeditated murder conviction and sentenced Williams as a violent offender to life imprisonment.  On appeal, Williams argues that:  (1) the evidence is insufficient to support his conviction for first degree premeditated murder; (2) the trial court erred in failing to dismiss the felony murder count of the indictment on the ground that no underlying felony was specified in the indictment; (3) the trial court erred in allowing the victim's mother to authenticate pictures of the victim at trial; (4) the State committed prosecutorial misconduct during closing arguments; (5) the trial court erred in considering Williams' prior arson conviction for impeachment purposes.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

George M. Googe, District Public Defender; Paul E. Meyers, Assistant Public Defender, Jackson, Tennessee for the Defendant-Appellant, Christopher Ivory Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Benjamin C. Mayo, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## FACTS AND PROCEDURAL HISTORY

On January 7, 2009, a Madison County Circuit Court jury convicted Williams of first degree premeditated murder and felony murder. The same day, the trial court merged his conviction for felony murder with his conviction for first degree premeditated murder and sentenced him as a violent offender to life imprisonment. Williams filed a motion for new trial on February 2, 2007, which the trial court denied. Williams then filed a timely notice of appeal.

**Trial.** Michael Wade Parson, an investigator with the Violent Crimes Unit of the Jackson Police Department, testified that he investigated the homicide of the victim, Myshesha Shaw, at 99 Dairy Street, Jackson, Tennessee, on July 3, 2007. He found the victim in her bedroom and noticed that she had bruises on both arms, bruises on her left and right cheeks, dried blood and lacerations to her lips, a small scratch on her neck, and an open laceration on her right leg. Investigator Parson noticed that both clothes on the bedroom floor and a pillow in the room had bloodstains on them. He also saw an Auburn University basketball jersey, a blue headwrap, and two BankcorpSouth ATM receipts near the victim's body. One of the ATM receipts was dated July 2, 2007, with a time of 3:53 p.m. Investigator Parson also stated that buccal swabs were taken from the Defendant-Appellant, Christopher Ivory Williams, and his brother, James Charles Williams, who was also known by the nickname of "240." The Defendant-Appellant identified his brother as a possible suspect during his interview with law enforcement.

Rochelle Staten, an officer with the Jackson Police Department, testified that he also responded to the crime scene at 99 Dairy Street on July 3, 2007. He stated that he was the first officer to observe the victim. He said that the victim was in the back bedroom of the house and was sitting on the floor with her back against the bed, as if she were watching television, but she was deceased. Officer Staten also noticed that the victim had "some marks on her face and on her lips that didn't appear right."

Terry Buckley, an investigator with the Jackson Police Department, testified that he was a patrol officer at the time that he was involved in the victim's case. Upon arriving at the scene, he took photographs, collected evidence, and made sketches of the crime scene. He observed an Auburn University basketball jersey with the number twelve, several clothes, a headwrap, as well as a bed sheet and pillow with bloodstains in the bedroom where the victim's body was found.

Aimee Oxley, a crime scene analyst and latent fingerprint examiner for the Jackson Police Department, testified that she was involved in the collection of evidence associated with the victim's case. She took several photographs of the victim at the hospital that depicted the injuries on her face, neck and arms. However, she was unable to collect any

latent fingerprints on the chrome pipe that was found in the bedroom where the victim's body was found.

Michael Holt, a captain with the criminal investigation division of the Jackson Police Department, testified that he was a unit commander with the violent crimes unit at the time he investigated the victim's case. He stated that he interviewed the Defendant-Appellant, Christopher Ivory Williams, and took a statement from him. He then read Williams' statement to the jury. In the statement, Williams alleged that his brother, "240" and the victim had been making fraudulent checks together. Williams said that he recently discovered that Ken Ashford, who also went by the name Marcus Armstrong, was the father of the victim's oldest daughter and that he and the victim argued about Ashford all the way from Mississippi to his mother's home in Tennessee. Williams stated that he and the victim had talked about posting Ashford's bond and making fraudulent checks in Ashford's name so that Ashford would be arrested for their crimes. Williams claimed that the victim had previously been making fraudulent checks and had at least $13,500 in her bank account. When Williams discovered that the victim's apartment was in Ashford's name, Williams accused her of saving all of her money for Ashford instead of for him. Williams was afraid that the victim was going to resume her relationship with Ashford and was going to have Williams arrested for the victim's and Ashford's crimes. Williams admitted that he "smacked" the victim "a little bit" and busted her lip shortly before the victim's death but claimed that his brother, "240," and the victim had also been fighting on the night of July 2, 2007. Williams said he returned to his mother's home at 5:30 a.m. on July 3, 2007, and woke up the victim. The victim immediately complained that her arms hurt, and Williams observed bruises on her arms from her fight with "240." Williams informed the victim and his mother that he was going to kill "240" because he had hurt the victim and had been making fraudulent checks with the victim. Williams locked the victim in the bedroom and went outside to the porch. When Williams' mother came outside, he accused her of taking the victim's side. Williams then hit "240" in the back of the head during a fight. Williams stated that he again left his mother's house, and when he returned the next morning, Williams found the victim dead. Williams' aunt instructed him to leave before the police arrived, and Williams caught a ride to Greenwood and spent the first night after the victim's death in a motel.

Cathy Ferguson, a Special Agent with the Tennessee Bureau of Investigation, testified that she interviewed Williams, the Defendant-Appellant, with Captain Holt. She also spoke with Williams alone after the conclusion of the first interview. Special Agent Ferguson told Williams that she did not believe his version of the events and asked him questions about the scratches on his arms. Williams then gave her a second written statement, in which he admitted that he and the victim fought from approximately 8:00 p.m. on Sunday night until early Monday morning. He stated that during their fight, he grabbed the victim by her throat

and pinned her against the wall. He admitted punching the victim in her stomach, side, back and chest, although he claimed, "I didn't hit her as hard as I could." Special Agent Ferguson said that Williams then told her that his mother called him on Monday to let him know that "240" had been hitting the victim. Williams returned to his mother's home, and the victim told him that "240" had been beating her with a "cane fishing pole" because the victim owed "240" some money and because she refused to release her ATM pin number to him. Williams could not recall whether the victim eventually gave the pin number to "240" or not. Williams later told the victim to go to the bedroom, and she refused, so he "pushed her hard" and she fell into the room and hit a wall, causing "her head [to] bounce[] against the wall." He said the victim "held her head and sat down on the bed crying." They talked for a few minutes, and Williams locked her in the bedroom. When Williams' aunt arrived, William unlocked the bedroom door. Before Williams left his mother's house, he hugged the victim, who was still sitting on the bed crying.

Amanda Lynn Jordan, the vice president over operations for BankcorpSouth, identified still photographs and paperwork from the Highland Park branch of the bank showing that individuals attempted to access the victim's bank account on July 2, 2007 at 3:53 p.m. She explained that the victim's account had carried a zero balance since June 22, 2006, and had been inactive since that time. She also identified a still photograph from the ATM machine that was not accompanied by a bank transaction. She stated that a man wearing a Auburn jersey with the number twelve was depicted in the picture. She also identified three other still photographs accompanied by bank transactions that depicted the same man wearing an Auburn jersey and a black stocking cap. Some of the photographs also depicted a female with the man in the Auburn jersey, and these photographs showed the female attempting to conduct some of the bank transactions. Jordan also identified several pictures of the same man in the Auburn jersey attempting to access the victim's account with two different cards at the Madison Park branch of the bank on July 2, 2007 at 8:34 p.m. Jordan said that one of the cards was a BankcorpSouth ATM card, but she could not identify the other card. The female was not depicted in the photographs taken at the Madison Park branch.

Roger Lee Newberry testified that he was Christopher Ivory Williams' cousin. He said that he went over to Williams' mother's home at 99 Dairy Street on July 2, 2007 and heard "hollering and yelling and fussing." When he walked into one of the bedrooms, he saw Williams, the Defendant-Appellant, hitting the victim and asking her for "the numbers". Later, Newberry and Williams' brother and mother all tried to get Williams to stop hitting the victim. Williams told them to "get out of his business" but stopped hitting the victim at that time. Newberry said that later that night Williams asked him to drive him to a BankcorpSouth ATM machine at approximately 8:30 p.m. Before leaving to go to the ATM, Newberry saw Williams' brother, James Charles Williams, arrive at the house. Shortly

thereafter, he drove Williams to the ATM. He saw that Williams was unable to get any money from the ATM, and Williams informed Newberry that the victim had given him the wrong ATM pin number. When he and Williams returned from the ATM, the victim was at the house and was alive and well. Newberry said that he stayed a little while longer at the house before going home. After he left the house that night, he called to check on the victim's welfare. Newberry confirmed that he never took Williams' brother, "240", to an ATM the night of July 2, 2007 and never saw "240" beating up the victim that night or demanding the victim's ATM pin numbers.

Eric Echtenkamp, the assistant coroner for the Madison County Medical Examiner's office, testified that he was responsible for filing a report regarding the victim's body for the medical examiner's office. Upon examination, he noticed hemorrhaging around the victim's eyes, which indicated a lack of oxygen. He also observed numerous cuts, bruises, and bleeding on the victim's body, as well as a puncture wound on her left shin. Echtenkamp opined that the victim's cause of death was homicide by strangulation.

Patrick Ihrie, a Special Agent forensic scientist with the Tennessee Bureau of Investigation, testified that the blood from the bedroom pillows came from the victim. He also stated that a swab taken from the victim's left arm provided a limited partial DNA profile which showed that the DNA came from a male, that James Charles Williams could be excluded as a contributor of that DNA, and that Christopher Ivory Williams, the Defendant-Appellant, could not be excluded as a contributor of that DNA. Special Agent Ihrie acknowledged that the presence of Christopher Ivory Williams' DNA on the victim did not mean that the Defendant-Appellant actually inflicted the injuries to the victim. He further acknowledged that he had no way of knowing how the Defendant-Appellant's DNA got on the victim's arm.

Dr. Adele Lewis, an assistant medical examiner for the State of Tennessee, testified that he performed the autopsy of the victim. Dr. Lewis stated that the victim died of strangulation and/or asphyxia and blunt force injuries to her head, face, and neck. He stated that the victim also had abrasions to both cheeks, a large amount of blood underneath her scalp, scrapes on her left shoulder, cuts on her left leg, bruising on her arms and legs, cuts and bruises on her lips, scrapes and bruises on the right side of her neck, and hemorrhaging on her right eyelid consistent with strangulation.

**ANALYSIS**

**I. Sufficiency of the Evidence.** Williams contends that the evidence was insufficient to support the jury's finding that he acted with premeditation or intentionally killed the victim. He asserts that Newberry's testimony merely showed that he observed Williams and

the victim fighting but saw that the victim was fine at the time that he and Williams returned from the ATM. In addition, Williams notes that his own statement showed that he and the victim had been fighting and that he had hit the victim but had not hit her as hard as he could. His statement further showed that the victim had also been fighting with his brother, James Charles Williams, shortly before her death. Regarding premeditation, Williams argues that "there was no evidence presented of use of a deadly weapon, there was no evidence of particular cruelty, there was no evidence of any threats or declarations of intent to kill made by [him], there was no evidence that [he] ever procured a weapon, there was no evidence of any preparation to conceal the crime, [and there was no] evidence of calmness immediately following a killing." Williams further contends that no evidence establishing his intent to kill was presented at trial. Instead, he argues that the evidence showed only that he and the victim fought over money and that the victim was later found dead.

In response, the State argues that a rational jury could have determined that Williams killed the victim intentionally and with premeditation based on the evidence presented at trial. The State asserts that there was no evidence at trial that the victim provoked Williams; instead, the proof showed that Williams believed that the victim and Ashford were setting him up to be arrested and that Williams was unsuccessful in obtaining the victim's money from the ATM. The proof further showed that Williams beat the victim from Sunday night to Monday morning, and when the victim failed to release her pin number so that he could withdraw her money from the ATM, Williams strangled her, all of which supports the argument that Williams acted intentionally and with premeditation. We agree.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Matthews, 805 S.W.2d

at 779 (citation omitted). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The State may prove the perpetrator's identity using only circumstantial evidence. State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Id. (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (citation omitted)). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2003). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

We agree with the State that, based on the proof at trial, a rational jury could have found that Williams, the Defendant-Appellant, killed the victim intentionally and with premeditation. Newberry testified that he observed Williams hitting the victim and asking her for "the numbers." Newberry later drove Williams to the ATM machine, but Williams told him that he was unable to withdraw any money because the victim had given him the wrong ATM pin number. Testimony from Jordan, the bank representative, identified still photographs showing that an individual resembling Williams attempted to withdraw money from the victim's bank account at the Highland Park Branch of the bank at 3:53 p.m. and at the Madison Park branch of the bank at 8:34 p.m. on July 2, 2007. Williams' first statement to police made it clear that he believed that the victim and Ashford were setting him up to be arrested, thereby preventing him from receiving any of the alleged $13,500 that the victim possessed. In his second statement to police, Williams admitted that he and the victim fought from 8:00 p.m. Sunday to the early morning hours on Monday. He also acknowledged punching the victim in the stomach, side, back, and chest; he also admitted pushing her so hard that her head bounced against the bedroom wall. The proof showed that Williams had scratches on his arms following the victim's death, and although Williams' brother, "240," was excluded as a contributor of the partial DNA profile recovered from the victim's arm, Williams could not be excluded as a contributor of the DNA. Dr. Lewis confirmed that the victim died of strangulation and/or asphyxia and blunt force injuries to her head, face, and neck. We conclude that the evidence as a whole supported the theory that Williams strangled the victim when it became clear that he would not receive any money from her. Although Williams attempted to cast blame on his brother for the victim's death, no other evidence supported this defense theory, and the jury was free to determine that Williams' statements implicating his brother in the victim's death were not credible. See Odom, 928 S.W.2d at 23. Therefore, we conclude that there was more than sufficient evidence to support Williams' conviction for first degree premeditated murder.

**II. Dismissal of Felony Murder count of Indictment.** Williams contends that the trial court erred in failing to dismiss the felony murder count in the indictment. Specifically, he argues that because the felony murder count did not specify the underlying felony, it failed to place him on notice of the appropriate mens rea for the underlying offense and failed to fulfill the requirements set out in State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Although Williams acknowledges that the trial court merged the felony murder conviction with the first degree premeditated murder conviction, he maintains that the felony murder count of the indictment allowed the State to increase its odds of obtaining a murder conviction and allowed the State to place the defense at a disadvantage regarding trial preparation.

In response, the State argues that the indictment was sufficient because it provided Williams with notice of the charged offense, gave the trial court jurisdiction over the case, and protected Williams from double jeopardy. Moreover, the State contends that this court has previously held that a felony murder indictment must allege that the murder was committed during the perpetration of a felony but need not include specific allegations of the elements and facts of the underlying felony. See State v. Alfonzo E. Anderson, No. W2000-00737-CCA-R3-CO, 2002 WL 1558491, at *2 (Tenn. Crim. App., at Jackson, Jan. 9, 2002) (citing State v. Jimmy Wayne Baker, No. W1998-00531-CCA-R3-CD, 2001 WL 252082, at *11 (Tenn. Crim. App., at Nashville, Mar. 14, 2001), perm. to appeal denied (Tenn. Sept. 10, 2001); Alan D. Lawhorne v. State, No. 273, 1990 WL 70908, at *2 (Tenn. Crim. App., at Knoxville, May 31, 1990), perm. to appeal denied (Tenn. Oct. 1, 1990)). Finally, the State asserts that the trial court properly denied Williams' motion to dismiss the felony murder count of the indictment. We disagree but conclude that the trial court's error harmless.

The United States Constitution and the Tennessee Constitution state that a defendant is entitled to knowledge of "the nature and cause of the accusation." U.S. Const. amend. VI; Tennessee Const. art. I, § 9. Pursuant to State v. Hill, an indictment is valid if it contains sufficient information "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." 954 S.W.2d at 727. In addition, pursuant to Tennessee Code Annotated section 40-13-202, the indictment must

> state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner so as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. . . .

T.C.A. § 40-13-202 (2006).

Here, count two of the indictment charging Williams with felony murder provided:

> THE GRAND JURORS of Madison County, Tennessee, duly empaneled and sworn, upon their oath, present that
>
> CHRISTOPHER IVORY WILLIAMS
>
> on or about July 3, 2007, in Madison County, Tennessee, and before the finding of this indictment, did unlawfully and recklessly kill MYSHESHA SHAW during the perpetration of or attempt to perpetrate a felony, in violation of T.C.A. § 39-13-202, all of which is against the peace and dignity of the State of Tennessee.

Near the end of trial, the State acknowledged that count two of the indictment did not specify the underlying offense for felony murder. The trial court indicated that it would charge a particular underlying offense to the jury based on the proof presented at trial. The court also stated that it would not charge alternate underlying felonies because it was fearful that the jury would not reach a unanimous verdict. Defense counsel agreed that it was proper for the State to make an election regarding the underlying offense before the jury was instructed; however, he also argued that the State should have specified a particular underlying offense in the felony murder count of the indictment. The trial court noted that it had never seen a felony murder indictment where the underlying felony was not specified. However, the trial court later issued a ruling finding that count two of the indictment was sufficient:

> As to Count Two, of course, the first argument deals with the insufficiency of the indictment because in the indictment the State did not l[ist] a specific [underlying] felony. And they usually do.
>
> I've done considerable research on this matter. And I'll just say I've looked at the cases Vaughn [v.] Worthington, [No. E2007-00808-CCA-R3-HC, 2008 WL 58956, at *2 (Tenn. Crim. App., at Knoxville, Jan. 4, 2008)], which is a Court of Criminal Appeals case. . . .
>
> Also, there's a case, Mills vs. Lindamood, [No. M2007-01622-CCA-R3-HC, 2008 WL 544643, at *2-3 (Tenn. Crim. App., at Nashville, Feb. 19, 2008),] which is also a Court of Criminal Appeals case, citing and setting forth what has to be covered for the indictment in a felony murder.
>
> And, of course, [in] most [of] these cases . . . the State did set out the specific [underlying] felony in the indictment.

I have found cases where the State indicted the statute – Of course, we know that the felony murder statute, [Tennessee Code Annotated section] 39-13-[202(a)], includes several specifically delineated [underlying] felonies. I found cases where the State alleged all of them under the statute and then chose one at trial. I don't really see the difference in alleging all of them in the indictment and just saying that . . . a specific felony was committed.

Also, as part of this consideration we must look at Rule 12(b)(2). 12(b)(2) concerns defects in the indictment and it reads as follows: []Motions that must be made before trial; A, a motion alleging a defect in the institution of the prosecution; B, a motion alleging a defect in the indictment, presentment, or information, et cetera, it says. But at any time while the case is pending the Court may hereto claim that the indictment fails to show jurisdiction of the Court or to charge an offense.

And I think after reading these cases and looking at 12(b)(2) that I'm going to give the State the benefit of the doubt here and let Count Two go to the jury.

Now, as to what's been made out as to the specific felony, we're going to get into tremendous legal problems if we do an either/or here with robbery or kidnapping. I'm going to use kidnapping as the felony to charge to jury.

Neither the State nor the defense had anything to add following the court's ruling. Although the State had previously talked about using the offense of robbery or kidnapping as the underlying offense for felony murder, the trial court subsequently charged the jury with kidnapping as the only underlying offense for the felony murder count of the indictment.

In its ruling, the trial court noted that the defense failed to make a pretrial motion alleging a defect in the indictment pursuant to Tennessee Rule of Criminal Procedure 12(b)(2). This rule states, generally, that a failure to raise an objection prior to trial based on a defect in the indictment results in waiver. Tenn. R. Crim. P. 12(b)(2)(B); see also Wyatt v. State, 24 S.W.3d 319, 322 (Tenn. 2000). However, as noted by the court in this case, a claim that the indictment fails to charge an offense can be heard by a trial court at any time while the case is pending. Tenn. R. Crim. P. 12(b)(2)(B). Accordingly, the defense's failure to make a pretrial motion pursuant to Rule 12(b)(2)(B) does not result in waiver.

On the date of Williams' offense, felony murder was defined as "a killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse,

aggravated child neglect or aircraft piracy[.]" T.C.A. § 39-13-202(a)(2) (2006). In order to sustain the Appellant's conviction for felony murder in this case, the State was required to prove that the Appellant killed the victim in the perpetration of one of the specified underlying felonies in section 39-13-202(a)(2). The record shows that the State intended to prove that the killing was committed in the perpetration of kidnapping or robbery, but neither of these underlying offenses were specifically stated in the felony murder count of the indictment. Although the trial court noted the indictment's failure to designate an underlying felony for this count and specifically charged the jury with the offense of kidnapping as the underlying felony, we must determine whether the trial court's failure to dismiss this count of the indictment based on the absence of a specified underlying felony was error.

The Tennessee Supreme Court has held that the defendant must intend to commit the underlying felony at the time of the killing:

> Given the fact that the felony-murder rule is a legal fiction in which the intent and the malice to commit the underlying felony is "transferred" to elevate an unintentional killing to first-degree murder, we are reluctant to extend the doctrine to include cases in which there was no intent to commit the felony at the time of the killing. Thus, in a felony-murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim.

Id. at 107. In other words, "[a]lthough intent to kill is not required under the felony murder statute, the perpetrator must possess the requisite intent to commit the underlying felony for a felony murder conviction to be sustained." State v. John Dennis Rushing, No. 01C01-9501-CR-00020, 1996 WL 63920, at *6 (Tenn. Crim. App., at Nashville, Feb. 13, 1996), perm. to appeal denied (Tenn. July 22, 1996); see also T.C.A. § 39-13-202(b) (stating that no culpable mental state is required for first degree felony murder, other than the intent to commit the underlying felony). We note that the underlying felonies listed in section 39-13-202(a) have differing mens rea. Proof of the intent to commit the underlying felony, and at what point it existed, is a question of fact to be decided by the jury after consideration of all the facts and circumstances. State v. Buggs, 995 S.W.2d 102, 107-08 (Tenn. 1999) (citing Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

Here, the State failed to designate a particular underlying felony in the indictment and consequently failed to provide Williams with notice of the underlying offense and its mens rea, which resulted in an invalid indictment and precluded a lawful felony murder conviction. See Hill, 954 S.W.2d at 727; John Dennis Rushing, No. 01C01-9501-CR-00020, 1996 WL

63920, at *6.  Accordingly, the trial court did, in fact, err in failing to dismiss the felony murder count in the indictment.  However, we conclude that this error was harmless, given that the trial court merged the felony murder conviction with the first degree premeditated murder conviction.  See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").  Williams is not entitled to relief on this issue.

**III.  Identification of Victim's Photographs by Victim's Mother.** Williams argues that the trial court erred in allowing the victim's mother, Jeanette Dandrige, to authenticate pictures of the victim taken while the victim was alive and after she was deceased.  He contends that this testimony "was of minimal probative value as the identity of the victim was uncontroverted . . . and carried a risk of unfair prejudice due to its inflammatory nature." He also asserts that he was "substantially harmed" by the "inflammatory nature" of testimony provided by the victim's mother.

In response, the State contends that Dandridge's testimony regarding these photographs was relevant and probative because it established the corpus delicti and the identity of the individual alleged to have been killed.  See State v. Nesbit, 978 S.W.2d 872, app. at 901-02 n.2 (Tenn. 1998) (Although proof of a reasonable creature in being is not required by the current criminal code, the State must still prove the deceased's identity, or the corpus delicti, beyond a reasonable doubt, and "the defendant's statements alone are not sufficient to establish this element."); Bolden v. State, 203 S.W. 755 (Tenn. 1918) ("The evidence to establish the corpus delicti in cases of homicide must show that the life of a human being has been taken, which question involves the subordinate inquiry as to the identity of the person charged to have been killed . . . .").  The State also asserts that while the photographs identified by Dandridge may have been prejudicial, they were not unfairly prejudicial.

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978).  First, a photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence.  Id.  Second, a photograph must be relevant to an issue that the jury must determine before it may be admitted.  State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951).  However, if the photograph's "prejudicial effect outweighs its probative value," it should not be admitted.  See Tenn. R. Evid. 401 and 403; Banks, 564 S.W.2d at 951.  A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger

of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Banks, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id.

We conclude that the trial court did not abuse its discretion in admitting the photographs of the victim identified by her mother, Jeanette Dandrige. While the photographs were prejudicial to the defense, the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. The transcript shows that the photographs were properly authenticated by Dandridge and were relevant to the State proving the corpus delicti and the identity of the person killed beyond a reasonable doubt. Moreover, there was nothing gruesome, graphic, or horrifying about the picture of the deceased victim identified by Dandridge. Compare Banks, 564 S.W.2d at 950-51 (citing People v. Jenko, 102 N.E.2d 783, 785 (Ill. 1951)) ("[P]hotographs of [a] corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character."). The record shows that these photographs were not offered by the State merely to inflame the jury. Accordingly, Williams is not entitled to relief on this issue.

**IV. Prosecutorial Misconduct.** Williams contends that the State made improper remarks during closing argument that constituted prosecutorial misconduct. Specifically, he argues that the State improperly asserted during its closing that the reason Williams' mother and brother allowed the victim to be killed and/or were not called to testify by the State, even though they were witnesses to the victim's murder, was because they were fearful of Williams. He further argues that the record as a whole contains no other reference to the fact that fear was the reason why Williams' mother and brother allowed the attack of the victim to take place and were not called to testify. Finally, he contends that the State's remarks during closing improperly misled the jury and that he was prejudiced by the trial court's failure to provide curative measures regarding the remarks.

In response, the State argues that the prosecutor's statements were made in direct response to questions posed to the jury by the defense during closing arguments. The State contends that the prosecution's response of fear answered the question of why these individuals did not prevent Williams from killing the victim rather than why these individuals did not testify at trial. Finally, the State asserts that, based on the evidence at trial regarding Williams' threats to his brother and mother, it is reasonable to conclude that these family members were afraid of him. We agree with the State.

The defense made several comments during its closing about the State's failure to have Williams' mother and brother to testify, despite the fact that they were present at the time the victim was killed. The defense specifically posed the following questions to the jury during closing arguments:

> And I hear time and time again how there was no way for [the victim] to tell us what happened. And that's obvious. I know that's obvious. But there are a lot of other people that could tell [us] what . . . happened. And the thing is, we'll never know.

> And if all these other people are so innocent, so innocent they would be here today[,] and we don't even hear about their statements. Then why didn't they call the police? Why didn't they stop my client?

> Why did every time my client left did they not get [the victim] out of there? How could they not hear it? Apparently this beating went on over the course they're saying of days in a house that you're at and you're just going to let it happen? You're not going to call the cops? Why? If you're so innocent, why?

> It makes no sense. . . . And I would have liked to have heard why and I know y'all [sic] would have liked to have heard why.

> . . . .

> And if all these people knew that he intended to kill her, why would they do nothing, absolutely nothing?

> . . . .

> I just ask or I want to leave you with this. If they're so innocent, why did they allow this to happen? If they know so much information and are there today and are innocent, where are they now?

-15-

The State responded to the questions posed by the defense by making the following statements:

> The Defendant is making a large issue, and I understand why. A large issue of the fact that Christopher Ivory Williams' mother was not called to testify, and Christopher Ivory Williams' brother was not called to testify, witnesses to that beating right there, and the defense attorney asked you the question if they are so innocent, why allow this to happen? Fear. Fear.

Prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)).

The courts of this state have routinely noted that "closing argument is a valuable privilege that should not be unduly restricted." Bane, 57 S.W.3d at 425 (citation omitted). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. Id. However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper as to negatively affect the verdict: (1) "[t]he conduct complained of viewed in context and in light of the facts and circumstances of the case"; (2) "[t]he curative measures undertaken by the court and the prosecution"; (3) "[t]he intent of the prosecutor in making the improper arguments"; (4) "[t]he cumulative effect of the improper conduct and any other errors in the record"; and (5) "[t]he relative strength and weakness of the case." Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

We conclude that Williams failed to show that the prosecution's comments during closing argument affected the outcome of the trial to his prejudice. See Bane, 57 S.W.3d at 425. The prosecution's statements during closing were neither inflammatory nor improper. See Farmer, 927 S.W.2d at 591. We agree with the State that the prosecutor's remark about

fear was made in direct response to the questions posed by the defense during closing arguments and that the remark answered the question of why these individuals did not prevent Williams from killing the victim rather than why these individuals did not testify at trial. We also agree that there was evidence presented at trial showing that Williams made threats to his mother and brother, which adequately supported the prosecution's statements at closing that Williams' brother and mother were fearful of him at the time of the offense. Finally, we conclude that the trial court did not abuse its discretion in failing to provide curative measures regarding the prosecutor's remark. Accordingly, Williams is not entitled to relief on this issue.

**V. Consideration of Arson Conviction for Impeachment Purposes.** Williams contends that the trial court erred in considering his prior arson conviction for impeachment purposes. Specifically, he argues that an arson conviction may not be relevant to a defendant's credibility if the offense is committed without dishonesty. See State v. Vance Shelton, No. E2000-01632-CCA-R3-CD, 2000 WL 1858996, at * 5 (Tenn. Crim. App., at Knoxville, Dec. 20, 2000), perm. to appeal denied (Tenn. Apr. 9, 2001) ("[C]onvictions for 'setting fire with intent to burn' and 'arson' are not relevant to a defendant's credibility, absent evidence of the actual circumstances supporting the convictions.").

In response, the State argues that any error of the trial court in considering the arson conviction for impeachment purposes is harmless. Specifically, the State contends that Williams "has failed to argue and show how the improper inclusion of his arson conviction was so prejudicial in this matter and precluded him from testifying, especially considering the other ten prior convictions about which he does not complain." We agree with the State.

This Court reviews a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. See State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003). The admissibility of an accused's prior convictions is governed by Rule 609 of the Tennessee Rules of Evidence. Rule 609 permits the accused's credibility to be impeached by prior criminal convictions on cross-examination if certain conditions and procedures are satisfied. The conviction must be for a crime (1) punishable by death or incarceration in excess of one year, or (2) involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Generally, convictions that are ten years old or more cannot be used for purposes of impeachment. Tenn. R. Evid. 609(b). The State is also required to give reasonable written notice prior to trial of the particular convictions it intends to use to impeach the accused. Tenn. R. Evid. 609(a)(3). Before permitting the use of a prior conviction, the trial court must find that the probative value of the conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. Id. The trial

court shall rule on the admissibility of the prior conviction before the accused testifies. Id. If the court rules that the prior conviction is admissible to impeach, there is no requirement that the accused testify at trial in order to later challenge the court's ruling on the admissibility of the prior conviction. Id.

Before Williams made the decision regarding whether he would testify, the trial court held a hearing to determine whether any of Williams' prior convictions could be used for impeachment purposes. During the hearing, the court held that the following convictions were admissible for the purpose of impeachment: arson, possession of a prohibited weapon, felony failure to appear, aggravated burglary, identity theft, two convictions for forgery, facilitation of money laundering, money laundering and criminal impersonation.

We agree with the State's argument that Williams has failed to show how the trial court's admission of this one arson conviction, given the nine other convictions, was so prejudicial that it prevented Williams from testifying. Accordingly, we conclude that the trial court's determination that Williams' arson conviction would have been admissible for impeachment purposes is harmless. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Williams is not entitled to relief on this issue.

## CONCLUSION

Upon review, we affirm the judgment of the trial court.

---

CAMILLE R. McMULLEN, JUDGE

-18-